**SMITH EIBELER, LLC**
**Robert W. Smith, Esq. ID# 044341987**
**Christopher J. Eibeler, Esq. ID# 031772004**
**101 Crawfords Corner Road, Suite 1-105R**
**Holmdel, New Jersey 07733**
**(732) 935-7472**
**Attorney for Plaintiff**

-------------------------------------------------------X
                                     :   **SUPERIOR COURT OF NEW JERSEY**

**CHRISTOPHER D. ADAMS,**         :   **LAW DIVISION:  MONMOUTH COUNTY**
                                       :   **DOCKET NO:**

        **Plaintiff,**              :

**v.**                                :   **Civil Action**
                                       :

**SCCY INDUSTRIES, LLC d/b/a**       :
**SCCY FIREARMS, JOE ROEBUCK,**     :
**ABC COMPANIES (1-10) (fictitious names**  :
**of unknown entities), and JOHN DOES**  :   **COMPLAINT AND JURY DEMAND**
**(1-10) (fictitious names of unknown**    :
**persons),**                          :
                                       :

        **Defendants.**            :
                                       :
-------------------------------------------------------X

       Plaintiff, Christopher D. Adams, having an address of 11 Shady Tree Lane, Colts Neck, New Jersey 07722 (hereinafter "Plaintiff"), by way of Complaint against Defendants SCCY Industries, LLC d/b/a SCCY Firearms, Joe Roebuck, ABC Companies (1-10) and John Does (1-10) (collectively referred herein as "Defendants"), says as follows:

<u>**FACTS COMMON TO ALL COUNTS**</u>

<u>**THE PARTIES**</u>

       1.      Defendant, SCCY Industries, LLC d/b/a SCCY Firearms is a limited liability company with its primary offices located at 1800 Concept Court, Daytona Beach, Florida 32114 (hereinafter the "Company" or "SCCY").

2.    SCCY is in the business of designing, manufacturing and selling firearms and related products.  This is a highly-regulated industry.

3.    Defendant Roebuck was the sole owner and Chief Executive Officer of Defendant SCCY at all times relevant herein.

4.    Defendants ABC Companies and Jane/John Does are fictitious entities and persons whose identities are yet unknown.

5.    Plaintiff is an attorney with over 20 years of experience practicing law.

6.    Plaintiff specializes in criminal defense, civil litigation and attorney ethics.

## **PLAINTIFF HIRED BY SCCY AS OUTSIDE COUNSEL**

7.    In or about 2016, SCCY was being investigated by the United States Department of State ("State Department") for possible violations of the International Traffic in Arms Regulations, 22 C.F.R. 120–30, ("ITAR").

8.    ITAR is a federal regulatory regime enforced by the State Department that controls and restricts the import and export of "defense articles."

9.    Defense articles include physical items such as firearms and firearm components, as well as technical data relating to such items, such as schematics and design plans.

10.    Pursuant to ITAR, a company must obtain permits and licenses from the State Department in order to import or export defense articles from foreign countries. ITAR prohibits companies from importing or exporting defense articles from certain countries, including China.

11.    The civil and criminal penalties for violating ITAR are severe.

12.    For example, anyone found to have willfully violated ITAR can be fined up to $1,000,000 for each violation and/or imprisoned for up to 20 years.

13.     Due to the complexity of ITAR compliance, SCCY hired FFLGuard, LLC ("FFLGuard") to assist the Company in responding to the State Department's regulatory inquiry.

14.     FFLGuard is a consulting company that provides consulting services to Federal Firearms Licensees (FFLs).

15.     According to their website, FFLGuard provides their clients with "a flat-fee legal service and firearms compliance program" run by attorneys and other experts who are "specialists in the area of firearms law and ATF/firearms compliance."

16.     At this time, SCCY's former Chief Operating Officer and General Counsel Paul Jannuzzo ("Jannuzzo") worked with FFLGuard on preparing SCCY's response to the State Department.

17.     Jannuzzo was the primary point of contact at SCCY for the State Department's ITAR investigation.

18.     SCCY terminated Jannuzzo in January 2017.

19.     At the time of his termination, Jannuzzo demanded that SCCY provide him with a severance package, threatening Defendant Roebuck that he would otherwise blow the whistle on SCCY and Roebuck's alleged willful violations of ITAR.

20.     These alleged violations included importing gun parts from China and making materially false and misleading statements to the State Department regarding ITAR compliance.

21.     Defendant Roebuck agreed to Jannuzzo's demands and began providing severance payments to prevent the threatened whistleblowing.

22.     Ultimately, Roebuck stopped making the payments claiming extortion and that Defendants had never committed any ITAR violations, including those being alleged by Jannuzzo.

23.     After SCCY stopped making the severance payments, Jannuzzo informed the State Department that Defendants SCCY and Roebuck had willfully violated ITAR.

24.     On or about July 5, 2017, SCCY filed a lawsuit against Jannuzzo (the "Jannuzzo litigation") alleging, inter alia, that Jannuzzo had extorted Defendants.

25.     On or about July 11, 2017, Defendant Roebuck as CEO of SCCY, executed a retainer agreement hiring Plaintiff and his law firm, Adams, Buchan & Palo, LLC (hereinafter the "Adams Firm"), to represent the Company in various aspects of the Jannuzzo litigation.

26.     On or about July 18, 2017, Plaintiff was admitted *Pro Hac Vice* to represent Defendants SCCY and Roebuck in the Jannuzzo litigation.

27.     On or about August 1, 2017 Plaintiff was also admitted *Pro Hac Vice* to represent Defendants SCCY and Roebuck in an additional litigation matter captioned "Jennings v. Roebuck and SCCY" (the "Jennings litigation"). The Jennings litigation was a post-judgment application to set aside a verdict that SCCY won in 2016.

28.     In or about winter, 2017, Plaintiff's representation of Defendants SCCY and Roebuck expanded as Plaintiff was asked to handle various additional legal matters for Defendants SCCY and Roebuck.

29.     At this time, Roebuck expressed his desire that Plaintiff handle all legal matters involving SCCY.

30.     On one such occasion, in or about December 2017, Plaintiff was tasked to interview the Company's President, Wayne Holt.

31.     ██████████████████████████████████████████
██████████████████████████

4

32.   

33.

**PLAINTIFF'S EMPLOYMENT RELATIONSHIP WITH SCCY**

34.   Around the time of the Holt interview, Defendant Roebuck asked Plaintiff to join SCCY as an employee.

35.   Defendant Roebuck offered Plaintiff the position of part-time General Counsel to commence January 1, 2018, with a starting salary of $250,000 per year as well as a 10% equity stake in the Company, vesting over 10 years.

36.   It was contemplated by Defendants that Plaintiff would continue to operate his law firm on a reduced basis, while serving part-time in the role of General Counsel to the firm, an arrangement sometimes referred to in the legal industry as "Outside In-house Counsel." Defendant Roebuck advised that he and SCCY would continue using Plaintiff and the Adams Firm as outside counsel for various litigation matters, in addition to Plaintiff serving as SCCY's General Counsel.

37.   Plaintiff immediately declined the offer, explaining to Defendant Roebuck that he could not serve as General Counsel of a Florida corporation without being admitted to the Florida Bar.

38.   Defendant Roebuck then offered Plaintiff the position of "Special Assistant to the CEO."

39.     Defendant Roebuck and Plaintiff agreed that the Special Assistant role would be part-time, and that Plaintiff would be able to continue to operate his law practice in New Jersey.

40.     Defendant Roebuck further stated that SCCY would continue to use the Adams Firm as outside counsel for various litigation matters, including but not limited to the ongoing Jannuzzo and Jennings litigations.

41.     In connection therewith, Plaintiff agreed to reduce his hourly rate for legal work to $250 per hour for any time billed in his role as outside counsel, in recognition of the $250,000 per year salary and  10% equity in the Company that came with his new employment position with SCCY.

42.     Plaintiff accepted Defendant Roebuck's offer and began serving as Special Assistant to the CEO on January 1, 2018.

43.     Shortly thereafter, Defendant Roebuck informed Plaintiff that his starting salary was being increased to $260,000 because it allowed for "round numbers" in payroll.

44.     In his role as Special Assistant, Plaintiff was responsible for providing Defendant Roebuck guidance on issues relating to the Company's business operations and strategies.

45.     Among other things, Plaintiff assisted the CEO with coordination of the Company's expansion into Tennessee, recruitment of employees and executives, human resources matters, oversight and management of all employees and advice and counsel on legal matters where Plaintiff's law firm was not serving as outside counsel.

46.     As special assistant to the CEO, Plaintiff was expected to interface with all employees and oversee all activities of the Company as if he was acting on behalf of Roebuck. This allowed Roebuck to concentrate his attention on developing new product lines.

47.     Additionally, Plaintiff was expected to help conduct regular board meetings with Defendant Roebuck and other key employees of SCCY, including Chris Agnes (VP of sales), Darren Peters (VP of engineering) and Brian Eicher (Executive VP).

48.     Plaintiff also continued to provide monthly invoices to Defendants for the services his law firm provided as outside counsel in litigation, applying the agreed-upon reduced rate.

49.     Defendants continued to separately pay the Adams firm for these services.

50.     In or about March 2018, Defendant Roebuck informed Plaintiff that as a SCCY executive, he was entitled to a car allowance as a fringe benefit of his employment.

51.     Thereafter the Company assumed Plaintiff's car payments at a cost of approximately $1,300 per month.

52.     In or about March 2018, Defendant Roebuck asked Plaintiff what SCCY could do to convince Plaintiff to close his legal practice and join the Company on a full-time basis as its President and General Counsel.

53.     Plaintiff told Defendant Roebuck that he needed some time to think about the offer, but that at a minimum, SCCY would need to substantially increase his compensation.

54.     Plaintiff explained that he had spent years building the Adams Firm into a highly successful and lucrative practice.

55.     Plaintiff further explained that joining SCCY full-time would have a significant impact on the amount of time he could spend with his family in New Jersey.

56.     In or about May 2018, Plaintiff was substituted out as outside counsel in the Jannuzzo litigation, in favor of another law firm, to allow Plaintiff more time to focus on his business duties and responsibilities as Special Assistant to the CEO.

57.     In or about May 2018, Defendant Roebuck, Plaintiff, and other SCCY executives traveled to Maryville, Tennessee to visit the site where SCCY was planning to build a new manufacturing facility.

58.     At this time, Defendant Roebuck again told Plaintiff that he wanted him to join SCCY full-time in the position of President and General Counsel.

59.     Plaintiff told Defendant Roebuck that he would continue to think about it.

60.     In or about July 2018, Defendant Roebuck again brought up his offer to Plaintiff and asked what he would have to do to convince Plaintiff to join SCCY full-time as President and General Counsel.

61.     At this time, Plaintiff replied that he could only take the job if he could have a salary of between $700,000 and $800,000 per year, and that he would not have to move his family out of New Jersey.

62.     Defendant Roebuck responded that he could not pay Plaintiff his desired salary right away, but would agree to do so gradually over a one-year period.

63.     Based upon Defendant Roebuck's express promise, Plaintiff accepted Roebuck's offer for employment in or around July 2018.

64.     On or about July 26, 2018, Defendant Roebuck informed Plaintiff that he was raising his salary to $7,000 per week ($364,000 per year) and would gradually raise his salary over the course of the next approximately 18 months.

65.     Plaintiff began the process of closing and winding up the Adams Firm, which was going to be complex and time-consuming.

66.     Roebuck agreed that SCCY assume the lease payment of the office space in New

Jersey that the Adams Firm occupied so that Adams would continue to have a New Jersey office to continue performing his duties and responsibilities in connection with his SCCY employment.

67. In connection therewith, Plaintiff agreed to inform his law partners that he was leaving to become a full-time SCCY employee on or about January 1, 2019.

68. At all times during his employment with SCCY, Plaintiff was employed in New Jersey and paid all appropriate New Jersey taxes in connection with employment.

69. In fact, Roebuck and SCCY installed a video conferencing system in the Adams Firm's New Jersey office so that Plaintiff could participate in daily meetings at SCCY while he was physically in New Jersey.

70. At this time, Defendant Roebuck re-affirmed his promise to continue raising Plaintiff's salary over time in accordance with Plaintiff's expressed requirements.

71. Defendant Roebuck further affirmed at this time that Plaintiff would be the President and would serve on the executive team of the Company along with Defendant Roebuck and Darren Peters, the Chief Operating Officer.

72. Meanwhile, Plaintiff continued to wind up the Adams Firm.

73. Plaintiff ceased taking new clients and started wrapping up matters with existing clients. This, in turn, resulted in a significantly decreased amount of profits for the firm.

74. Plaintiff and Defendant Roebuck agreed that, notwithstanding the salary increase, Plaintiff would continue in his position as Special Assistant to the CEO until such time as he was admitted to the Florida Bar and could assume the position of SCCY's General Counsel.

75. Once Plaintiff was admitted to the Florida Bar, Plaintiff would formally assume the position of President and General Counsel.

76.     On or about August 14, 2018, Plaintiff flew to West Palm Beach with Defendant Roebuck to speak to the attorneys in the Jannuzzo Litigation.

77.     During this trip, Defendant Roebuck discussed the timing of when Plaintiff would be announced President of the Company.

78.     While in West Palm Beach, Plaintiff and Defendant Roebuck also met with an estate lawyer to draw up an estate plan for Defendant Roebuck.

79.     In recognition of the fact that Defendant Roebuck had no children and his wife was not involved with or capable of running the company, Roebuck advised Plaintiff that he wanted him to be in charge of the Company in the event anything was to happen to him.

80.     Defendant Roebuck further expressed his desire for Plaintiff to be the executor of his estate.

81.     On or about August 23, 2018, Plaintiff met with the Company's corporate attorneys to discuss formalizing Plaintiff's promotion to President and General Counsel and the restructuring that would entail.

82.     During the meeting, the parties also discussed formalizing Defendant Roebuck's equity promise made to Plaintiff.

83.     Defendant Roebuck attended the meeting via telephone and confirmed that Plaintiff would be assuming the position of President and General Counsel and would eventually receive a 10% ownership interest in SCCY.

**PLAINTIFF'S KNOWLEDGE OF ITAR VIOLATIONS**

84.     In or about September 2018, Plaintiff learned about the documents Jannuzzo apparently sent to the State Department, alleging that Defendants intentionally committed ITAR

violations.

85.     Jannuzzo alleged that SCCY engaged in certain ITAR violations.

86.     Jannuzzo alleged that Defendant Roebuck had been aware of and was actively involved in all of the ITAR violations committed by the Company.

87.     Jannuzzo alleged that SCCY was utilizing a complex scheme to disguise the Chinese-origin of gun parts that were supposedly manufactured in South Korea.

88.     Jannuzzo alleged that SCCY was importing gun parts from a South Korean company called Susung, but that Susung was merely a "straw" company importing gun parts from China and repackaging them for export to SCCY.

89.     These allegations, that SCCY was knowingly and deceptively importing Chinese gun parts/molds, were directly contradictory to the statements and disclosures made to the State Department in 2016.

90.     If Jannuzzo's allegations were true, Defendants SCCY and Roebuck would be at risk of facing significant civil and criminal penalties.

91.     

92.

93.

94.

95.     Shortly thereafter, Plaintiff met with Mr. Peters, Mr. Eicher, and Defendant Roebuck in Chicago, Illinois.





105.    It was Plaintiff's understanding from Jannuzzo's allegations that Mr. Chapman

served as the intermediary between SCCY and Susung, the South Korean "straw" company.

106.

107.

108.

109.

110.

111.    On or about September 17, 2018, Plaintiff flew to Los Angeles to meet with Mr.

Chapman.

112.    Defendant Roebuck unexpectedly advised that he was going to travel with Plaintiff

and join in the meeting with Mr. Chapman.

113.    Defendant Roebuck insisted he attend the meeting because Mr. Chapman needed

to "feel comfortable" and only he could accomplish this.

114.     At the meeting, Mr. Chapman began the discussion by telling Defendant Roebuck and Plaintiff that he had been discussing all issues with Mr. Eicher of SCCY and that there was nothing to be concerned about because he and Mr. Eicher had used "WhatsApp" to conduct all communications about the subject.

115.     WhatsApp is a popular cross-platform instant-messaging application with end-to-end encrypted instant messaging.   End-to-end encryption is a security feature that protects messages from being accessed by anyone other than the sender and recipient.   In fact, the WhatsApp company itself cannot access user messages.

116.     During the meeting, Defendant Roebuck told Mr. Chapman that he should be comfortable with Plaintiff because he was the General Counsel and new President of SCCY and that Plaintiff needed to ask him some questions about Susung and Jannuzzo's allegations.

117.     Plaintiff explained Jannuzzo's allegations about Susung to Mr. Chapman but, before Mr. Chapman could respond, Defendant Roebuck interjected that the allegations were not true.

118.     Roebuck then suggested that Mr. Chapman gather documents to disprove the allegations.

119.     ███████████████████████ Plaintiff told Mr. Chapman they needed to see Susung's production records from their South Korea manufacturing facility, as well as a copy of Susung's United States – Korea Free Trade Agreement Certificate of Origin.

120.     Plaintiff told Mr. Chapman that he would follow-up with him via email regarding the Susung documents.

121.     In response, Mr. Chapman asked Plaintiff to communicate with him over

WhatsApp rather than email.

122.    After Plaintiff finished speaking to Mr. Chapman, Mr. Chapman asked to speak with Defendant Roebuck alone and asked Plaintiff to leave the room.





131.

132.

133.

134.

135.

136.

137.

138.

139.

140. ███████████████████████████████████████

████████████████

141. ███████████████████████████████████████

███

142. ███████████████████████████████████████

█████

143.    On or about September 25, 2018, during a SCCY meeting that Mr. Eicher did not attend, Defendant Roebuck expressed his frustration with Mr. Eicher and his ongoing usefulness to Plaintiff.

144.    Plaintiff found Defendant's timing odd given that Mr. Chapman had advised just one week earlier that he was communicating with Mr. Eicher about the Susung situation.

145. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████

146.    Thereafter, Plaintiff and an HR representative met with Mr. Eicher and informed him that SCCY was terminating his employment effective immediately.

147.    Mr. Eicher protested his termination and alleged that Defendant Roebuck was only taking this position because Mr. Eicher "knew too much" and Roebuck wanted him out.  Mr. Eicher even suggested that Mr. Jannuzzo would be a witness in any litigation involving Mr. Eicher.

148. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

149.   ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

150.   Around this time, Plaintiff was admitted to the Florida Bar as SCCY's "authorized house counsel." As a result, Defendant Roebuck announced to the entire Company that -- effective October 1, 2018 -- Plaintiff would become SCCY's President and General Counsel.

151.   On or about October 1, 2018, Mr. Chapman sent Plaintiff and Defendant Roebuck a "group text" on WhatsApp stating that he would prefer to send communications related to Susung through WhatsApp.

152.   Mr. Chapman attached a document explaining that WhatsApp's encryption feature prevented third parties, like the government, from accessing messages sent through the application.

153.   On or about October 16, 2018, Plaintiff traveled to Pittsburgh with Defendant Roebuck and Mr. Peters to attend a major industry convention put on by the National Association of Sporting Goods Wholesalers ("NASGW").

154.   At the convention, Defendant Roebuck announced to all of SCCY's sales representatives, customers, and potential customers, that Plaintiff was the new President and General Counsel of SCCY.

155.   In fact, Defendant Roebuck ordered new business cards for Plaintiff, reflecting his new positions, and rushed them to the convention so Plaintiff could hand them out.

156.   During this time, Defendant Roebuck was also considering buying a building in

Daytona to expand SCCY's Florida facilities.

157.    Defendant Roebuck asked Plaintiff if he would be interested in going in as partners and buying the Daytona property together.  Defendant Roebuck said that, since Plaintiff was a major part of the Company and its future, it would be great if they owned the building together. The purchase ultimately did not happen because the decision was made to focus on building the facility in Maryville, Tennessee.

158.    Roebuck was so pleased with Plaintiff's performance that on or about October 24, 2018, Defendant Roebuck raised Plaintiff's compensation to $8,000 per week ($416,000 per year).

159.    Only one week later, on or about November 2, 2018, Defendant Roebuck again increased Plaintiff's compensation to $9,000 per week ($468,000 per year).

160.    ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

161.    █████████████████████████████

162.    On or about November 27, 2018, during a discussion at SCCY, Defendant Roebuck asked Plaintiff about the status of winding up the Adams Firm and asked if Plaintiff and the Adams Firm were still taking on new clients and cases.

163.    Plaintiff advised that, pursuant to their July 2018 agreement that Plaintiff would become President and General Counsel of SCCY, Plaintiff had been winding up his practice and was not taking any new cases or clients.

164.    As a result of Plaintiff's actions in winding up the Adams Firm, Plaintiff experienced

19

a substantial decrease in the income he derived from the Adams Firm.  Plaintiff was able to balance this decrease in his income, however, with the increased salary he was then receiving from SCCY, as well as the further-increased salary he was promised going forward.

165.   Defendant Roebuck asked how quickly Plaintiff thought he could wind up the Adams Firm. Plaintiff responded that that he intended to tell his partners about his plans on January 1, 2019, and that he could completely wind up the practice within six months thereafter. Defendant Roebuck said he liked that plan and expressed an interest in expediting it.

166.   On Defendant Roebuck's invitation, Plaintiff traveled to and stayed in Florida from December 7-9, 2018 for a Christmas celebration with SCCY's executive team.  Defendant Roebuck paid for all of Plaintiff's travel and lodging expenses.

167.   Defendant Roebuck made it clear to Plaintiff that he saw Plaintiff as the future of SCCY.

168.   Defendant Roebuck attempted to allay any of Plaintiff's concerns about closing the Adams Firm and joining SCCY full-time.

169.   Defendant Roebuck made it very clear that he wanted to step away from managing the Company's day to day business, and leave that to Plaintiff and Mr. Peters.

170.   Specifically, Defendant Roebuck stated that Plaintiff would run the "front office" and Mr. Peters would run the "back office" (the manufacturing side of the company).

171.   On or about December 10, 2018, Plaintiff was informed that the State Department's investigation into the information that SCCY had disclosed in 2016 was still open and ongoing, and that the State Department required follow-up information from SCCY.

172.   The email received and transmitted to Plaintiff did not specify what additional

follow-up information the State Department was going to require SCCY provide. Rather, it was

merely a notice reminding SCCY of the continuing investigation and putting SCCY on notice that

the State Dep. would be seeking additional information in the near future.  The email came from

Mariam Osmun and identified her as the Compliance Specialist assigned to the case.



176.    On or about December 11, 2018, Plaintiff messaged Mr. Chapman through

WhatsApp (copying Defendant Roebuck) and asked if Mr. Chapman had been able to secure any

of Susung's production records or Susung's United States – Korea Free Trade Agreement

Certificate of Origin.

177.    Mr. Chapman replied that he was not able to secure the requested documents.

178.    However, Mr. Chapman further asked something to the effect of, "what would be

the potential refund if these documents were available."





185.    On or about December 19, 2018, FFLGuard conducted ITAR training at SCCY.

186.    Despite qualifying as a "responsible person" under ITAR, Defendant Roebuck did not attend.

187.    On or about January 2, 2019, Defendant Roebuck advised the ATF and the State Department that Plaintiff was an "empowered official" for SCCY for purposes of compliance communications.

188.    On or about January 3, 2019, Plaintiff emailed Ms. Osmun at the State Department and introduced himself as her point of contact at SCCY.

189.    On or about January 15, 2019, Ms. Osmun emailed Plaintiff to arrange a conference call for the following week on January 22, 2019.



███████████████████████████████████

193.    █████████████████████████████████████

████████████████████

194.    █████████████████████████████████████

██████████████████████████████████████

195.    █████████████████████████████████████

████████████████████████████████████████████████

██████████

196.    ██████████████████████████████████████

197.    In or about January 2019, Plaintiff continued to work with SCCY's builder/designer

planning the layout of SCCY's new Maryville, Tennessee facility.

198.    On or about January 19, 2019, Plaintiff traveled to Las Vegas, in part to allow

Plaintiff to attend the National Shooting Sports Foundation's ("NSSF") annual Shooting, Hunting,

Outdoor Trade ("SHOT") Show.

199.    Defendant Roebuck and Mr. Peters also attended.

200.    Throughout the trade show, Plaintiff interacted with customers and potential

customers at SCCY's booth and was repeatedly introduced as the Company President.

201.    █████████████████████████████████████

████████████████████████████████████████████████

████

202.    █████████████████████████████████████

██████████████████████████████████

203.    On or about January 22, 2019, Ms. Osmun moved the scheduled call with Plaintiff to the following day.

204.    

205.    

206.    The following day Plaintiff and Ms. Osmun had the conference call, with Mr. Peters in the room.

207.    Ms. Osmun introduced herself as the new Compliance Specialist assigned by the State Department to SCCY's case and advised that there were some open issues that needed to be addressed.

208.    Ms. Osmun advised that she would be sending a letter to SCCY, addressed to Plaintiff, outlining the information she needed.

209.    Without going into detail, Ms. Osmun mentioned the open issues included contact with China and compliance protocols.  Her outline of issues left Plaintiff with the impression that the State Department was skeptical of SCCY's earlier answers and required much more detail.

210.    

211.    

212.    

213.



221.     On or about January 28, 2019, at Defendant Roebuck's direction, Plaintiff

negotiated a lease on a building in Maryville, Tennessee, directly adjacent to the property SCCY

bought for its new facility.

222.     Around this time, Plaintiff started to notice that he was being deliberately left out

of key decisions, which was entirely inconsistent with his role as SCCY's President.

223.     For example, Defendant Roebuck informed Plaintiff that Mr. Peters would be

moving to Tennessee to oversee the construction of the new facility and the recruitment of new employees.

224.    Similarly, in or about February 2019, Defendant Roebuck informed Plaintiff that he and Mr. Peters decided to change course regarding the development of a key new product and planned to release it according to a different schedule than earlier agreed to.

225.    Plaintiff was surprised to learn about these decisions after they were already made, and was concerned that he was not involved in the decision-making process.

226.    Plaintiff believed that he should have been involved, because, as the Company President, he should be involved in strategy and planning for the future of the business.

227.    It quickly became clear to Plaintiff that Defendant Roebuck was intentionally reducing Plaintiff's involvement in decision making at the Company in retaliation ███

███████████████████████████████████████████████████████████████

████████████████████

228.    █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████

229.    At this point, Plaintiff was suddenly no longer included in meetings of the Company's executives.

230.    Instead, Defendant Roebuck began informing Plaintiff of decisions that were made at these meetings, without providing Plaintiff details regarding the decision-making process.

231.    Mr. Peters and Mr. Bolton were among the executives who were included in these meetings and participated in the decision-making process.

232.    On or about February 18, 2019, without any advance notice, Defendant Roebuck called Plaintiff and told him that SCCY had to let him go because they could not afford him.

233.    Defendant Roebuck stated that Plaintiff's salary was too expensive and he had to cut costs.

234.    This explanation was inconsistent with spending and hiring at the Company.

235.    Plaintiff asked Defendant Roebuck if they could discuss it the next day when he was free as he was in an airport lounge on his way home from a family vacation.

236.    The following day, Plaintiff spoke to Defendant Roebuck and asked him the real reason why he was being terminated.

237.    Defendant Roebuck again claimed that it was solely due to costs.

238.    The real reason why Plaintiff's employment was terminated was because ███ ████████████████████████████████████████████████████████████████ ████████████ he refused to participate in █████████████████ illegal conduct, and he refused to lie to the State Department.

239.    As a result of Defendants' conduct, Plaintiff has suffered damages.

## **FIRST COUNT**

## **VIOLATION OF THE CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA")**
## **N.J.S.A. 34:19-1, et seq.**

240.    Plaintiff repeats and realleges each of the prior allegations of the within Complaint as if set forth at length herein.

241.    Defendants' retaliation and adverse treatment of Plaintiff, including the termination of Plaintiff's employment, was wrongful and without cause or justification, and in retaliation for ████████████████████████████████████████████████████████

████████████████████████████████████ refusal to lie to the State Department, refusal to allow anyone from Defendants to lie to the State Department or to engage in other unlawful conduct as set forth herein.

242.   Plaintiff reasonably believed that Defendants' conduct and/or proposed conduct ██████████████████████████████████████ was in violation of laws, rules and/or regulations and/or fraudulent and/or incompatible with a clear mandate of public policy.

243.   Defendants' conduct is in violation of the New Jersey Conscientious Employee Protection Act ("CEPA").

244.   Defendant Roebuck engaged in, participated in, condoned, ratified, perpetuated, conspired, incited, coerced, induced and/or aided and abetted the CEPA violations.

245.   Defendants' acts or omissions were the cause of Plaintiff's harm and Defendants' acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

246.   As a result of Defendants' conduct, Plaintiff has suffered emotional distress, compensatory and other damages.

WHEREFORE, Plaintiff demands judgment against Defendants for harm suffered as a result of the violations of CEPA, N.J.S.A. 34:19–1 et seq., as follows:

> A.   Back pay and benefits;
>
> B.   Front pay and benefits;
>
> C.   Compensatory damages;
>
> D.   Consequential damages;

E.      Punitive damages;

F.      Equitable Relief;

G.      Pre-judgment interest and enhancements to off-set negative tax consequences;

H.      Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);

I.      Declaring that Defendants have violated the CEPA and requiring Defendants to take appropriate corrective action to end unlawful retaliation in the workplace; and

J.      Such other relief as may be available pursuant to the CEPA and which the Court deems just and equitable.

**SECOND COUNT**

**PROMISSORY ESTOPPEL**

247.    Plaintiff repeats and realleges each of the prior allegations of the within Complaint as if set forth at length herein.

248.    Defendants promised Plaintiff employment conditioned upon his agreement to sell and/or close the New Jersey law firm he founded (the Adams Firm).

249.    Plaintiff reasonably expected that Defendants' promise of employment was made in good faith and that Plaintiff would be able to perform in the promised position without being

required to violate the law.

250.    As alleged above, Defendants expected that Plaintiff would rely upon their promise to employ Plaintiff upon the sale and/or closure of the Adams Firm.

251.    Plaintiff did reasonably and detrimentally rely upon Defendants promise to employ him and, therefore, began to wind up and close the Adams Firm.

252.    As a result of Plaintiff's reliance upon Defendants' promise to employ him conditioned on the sale and/or closure of the Adams Firm, Plaintiff closed the Adams Firm, gave up lucrative clients and business and walked away from a vibrant and successful law practice.

253.    Thereafter, Defendants terminated Plaintiff's employment shortly after it began due to Plaintiff's objection ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

254.    Further, as a result of Defendants' conduct, Plaintiff traveled back and forth to Florida every other week and spent significant amounts of time away from his family.

255.    As a result of Defendants' above-described conduct, Plaintiff has suffered a definite substantial detriment.

256.    As a direct and proximate result of Defendants' aforesaid conduct, Plaintiff has suffered and will continue to suffer loss of earnings and other employment benefits, loss of expected future earnings through the Adams Firm, mental, physical and emotional distress, stress, humiliation, pain, irreparable damage to reputation, and harm to his career development.

WHEREFORE, Plaintiff demands judgment against Defendants for harm suffered due to the aforesaid promissory estoppel:

A.    Compensatory damages for loss of profit and benefits from self-employment, loss of wages and benefits, pain, suffering, stress, humiliation, mental anguish, and

emotional harm;

B.      Punitive damages;

C.      Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law); and

D.      Such other relief as the Court may deem just and equitable.

**THIRD COUNT**

**VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER PROTECTION ACT**

**Fla. Stat. §§ 448.101–105**

257.    Plaintiff repeats and realleges each of the prior allegations of the within Complaint as if set forth at length herein.

258.    Defendants' retaliation and adverse treatment of Plaintiff, including the termination of Plaintiff's employment, was wrongful and without cause or justification, and in retaliation for ███████████████████████████████████████ ██████████████████████████ and other unlawful conduct set forth herein.

259.    Plaintiff reasonably believed that Defendants' conduct and/or proposed conduct ███████████████████ and other unlawful conduct set forth herein, was in violation of laws, rules and/or regulations.

260.    Defendants' conduct is in violation of the Florida Private Whistleblower Protection Act.

261.    Defendant Roebuck engaged in, participated in, condoned, ratified, perpetuated, conspired, incited, coerced, induced and/or aided and abetted the violations of the Florida Private Whistleblower Act.

262.    Defendants' acts or omissions were the cause of Plaintiff's harm and Defendants' acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

263.    As a result of Defendants' conduct, Plaintiff has suffered emotional distress, compensatory and other damages.

WHEREFORE, Plaintiff demands judgment against Defendants for harm suffered as a result of the violations of the Florida Private Whistleblower Protection Act, as follows:

A.      Back pay and benefits;

B.      Front pay and benefits;

C.      Compensatory damages;

D.      Consequential damages;

E.      Punitive damages;

F.      Equitable Relief;

G.      Pre-judgment interest and enhancements to off-set negative tax consequences;

H.      Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);

I.   Declaring that Defendants have violated Florida Private Whistleblower Protection Act and requiring Defendants to take appropriate corrective action to end unlawful retaliation in the workplace; and

J.   Such other relief as may be available pursuant to the Florida Private Whistleblower Protection Act and which the Court deems just and equitable.

**SMITH EIBELER, LLC**

DATED:  February 3, 2020

**By:**     **/s/Christopher J. Eibeler**
**CHRISTOPHER J. EIBELER**
**Attorneys for Plaintiff**

## CERTIFICATION

Pursuant to <u>Rule</u> 4:5–1, it is hereby stated to the best of my knowledge and belief that the matter in controversy is not the subject of any other action pending or contemplated in any other court or of a pending arbitration proceeding.  Further, Plaintiff is unaware of any non-party who should be joined in the action pursuant to <u>R.</u> 4:28 or who is subject to joinder pursuant to <u>R.</u> 4:29–1(b) because of potential liability to any party on the basis of the same transactional facts.  I further certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with <u>Rule</u> 1:38–7(b).

**SMITH EIBELER, LLC**

DATED:  February 3, 2020

**By:**     **/s/Christopher J. Eibeler**
**CHRISTOPHER J. EIBELER**
**Attorneys for Plaintiff**

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues so triable.

**SMITH EIBELER, LLC**

**By:**     **/s/Christopher J. Eibeler**
            **CHRISTOPHER J. EIBELER**
DATED:  February 3, 2020            **Attorneys for Plaintiff**

**DESIGNATION OF TRIAL COUNSEL**

Pursuant to Rule 4:25–4, Christopher J. Eibeler, Esq. is designated as trial counsel for the

above- captioned matter.

**SMITH EIBELER, LLC**

**By:**     **/s/Christopher J. Eibeler**
            **CHRISTOPHER J. EIBELER**
DATED:  February 3, 2020            **Attorneys for Plaintiff**